[No. B167152. Second Dist., Div. Three. July 23, 2004.]

CALIFORNIA NATIONAL BANK, Plaintiff, Cross-defendant and Appellant, v.
STEVEN E. HAVIS et al. Defendants, Cross-complainants and Appellants.

1124

COUNSEL

Greenwald, Pauly, Foster & Miller, Joshua D. Wayser and Jeffrey J. Lewis for Plaintiff, Cross-defendant and Appellant.

Cunningham & Treadwell, Francis J. Cunningham III and Ryan L. Arnett for Defendants, Cross-complainants and Appellants.

OPINION

CROSKEY, J.—Before escrow closed on the sale of a developed parcel of real property, California National Bank (Bank) sent a letter to the escrow agent handling the sale stating that it had received "payoff funds" for the secured promissory note that it then held. The trial court interpreted that letter as a payoff demand statement under Civil Code section 2943,[1] concluded that Bank had made a binding acknowledgement that its outstanding note had been paid off, and held that Bank's secured interest in the property had been extinguished.

---

[1] Unless otherwise indicated, all further statutory references are to the Civil Code.

In this appeal by Bank from the resulting adverse summary judgment, we must determine first whether, as a matter of law, the letter actually meets the statutory requirements of a payoff demand statement. If not, we must then consider whether the parties reasonably could have relied on the contents of that letter to close escrow. As will be discussed, we conclude that, as a matter of law, Bank's letter was *not* a payoff demand statement. The use of the term "payoff funds" in the letter was not sufficient to transform a letter advising the escrow agent of the status of the transaction into a payoff demand statement binding on the Bank. We further conclude that there exist triable issues of fact as to whether the parties could reasonably have relied on the letter to close escrow when that letter is read together with proffered evidence of contemporaneous oral communications between the parties, and the pertinent escrow instructions. We therefore reverse the judgment entered in favor of defendants Steven E. Havis et al. (hereafter, lender defendants)[2] after the trial court granted their motion for summary judgment on Bank's complaint to establish and enforce its priority security interest in the subject real property.

## *FACTUAL AND PROCEDURAL BACKGROUND*

This case involves a dispute between Bank and lender defendants over the priority of their respective liens on a parcel of developed real property located in Beverly Hills (property). Bank claims that it has a first priority secured interest in the property and filed an action against lender defendants, alleging causes of action for specific performance of its deed of trust, appointment of receiver, judicial foreclosure, breach of written contract, imposition of a constructive trust, and for money had and received. Lender defendants responded, claiming that they hold the only secured interest in the property and filed a verified cross-complaint for declaratory relief, quiet title, cancellation of instruments, injunctive relief, and slander of title. Thereafter, lender defendants filed motions for summary judgment on the complaint and on their cross-complaint. The evidence submitted in support of, and in opposition to, those motions for summary judgment was undisputed and revealed the following:

---

[2] The defendants that moved for summary judgment included Steven E. Havis, Trudy C. Havis, Bruce Horwitz Family Limited Partnership, a limited partnership, Walter J. Ng, Maribel Ng, Fred L. Loupy, Lidia E. Loupy (defendants). These defendants also filed a cross-complaint against Bank, along with cross-complainants R.E. Loans 92, a California limited partnership, R.E. Loans 94, a California limited partnership, and R.E. Loans 02, a California limited partnership (cross-complainants). Cross-complainants also moved for summary judgment on their cross-complaint against Bank. Both parties refer to the defendants and cross-complainants as the "lender defendants" in their respective briefs. Although this does not accurately characterize the procedural posture of these parties, for the sake of clarity we adopt the parties' designation of both the defendants and cross-complainants as "lender defendants."

### 1. The Original Transaction and Bank's Deed of Trust on the Property

In October 1998, Bank's predecessor in interest loaned Joseph Keyshawn Johnson (Johnson) $1.2 million (Johnson loan) to buy the property where Johnson operated a restaurant. The loan was secured by a first deed of trust on the property in favor of Bank (Bank deed of trust). A month after the purchase, Johnson conveyed the property to Keyshawn, Inc., a Nevada Corporation (Keyshawn).

### 2. The Sale of Property to ICMG

In June 2002, Johnson entered into an agreement to sell the property to Investor's Capital Management Group, Inc. (ICMG) for $2 million and opened an escrow with Wilshire Escrow Company (Wilshire Escrow). ICMG obtained financing for this purchase from Gold Mountain Financial Institution, Inc. (Gold Mountain). Gold Mountain agreed to finance the sale on the express written condition that its loan would be a lien in first priority on the property.

Gold Mountain gave escrow instructions to Wilshire Escrow stating that "[b]y accepting these instructions, you agree that you will follow each of the requirements and instructions set forth below." The escrow instructions provided: "Do not record if you are aware of any liens which affect the subject property, other than liens expressly agreed to herein, *which are not paid in full in escrow and which are not cleared of record.*" (Italics added.)

#### a. The June 20, 2002, Payoff Demand Statement

On June 20, 2002, before escrow closed, Bank prepared a payoff demand statement for Johnson's financial advisers. Wilshire Escrow also received a copy. This statement provided a breakdown of the sums owing under the Johnson loan, including principal, interest, and loan fees, which totaled $1,165,422.86. It also included the required per diem interest amount and stated that it would expire in 30 days. Bank, however, did not receive funds to pay off the Johnson loan within the 30-day period.

#### b. Bank Sent the Parties a Letter Indicating that It Had Received Funds Outside of Escrow to Pay Off the Johnson Loan

On July 24, 2002, ICMG delivered a check to one of Bank's branches in the amount of $1,175, 247.14, which purported to pay off the Johnson loan. Five days later, on July 29, 2002, Bank employee Cleo Douglas (Douglas)

sent, via facsimile, a letter to Wilshire Escrow stating that bank had "received payoff funds" *outside of escrow* for the Johnson loan (Douglas letter). The Douglas letter stated in pertinent part:

"This letter is to verify that California National Bank received payoff funds for the above referenced loan on July 24, 2002, in the amount of $1,175,247.14.

"It is our policy to issue the Full Reconveyance, 10 days after receipt of the pay off check. Therefore, a Full Reconveyance will be sent to the County Recorders on or about August 5, 2002."

> c. *Wilshire Escrow's and Gold Mountain's Response to Bank's Letter*

Both the escrow agent and Gold Mountain responded to the Douglas letter. The escrow agent testified that "[e]veryone was totally aghast at the prospect that the buyer [ICMG] was paying off this existing first trust deed loan, so everyone was on heightened alert."[3] Wilshire Escrow's agent testified that after he received Douglas's letter, he called her to confirm that Bank had been paid off.

Douglas's declaration, which for purposes of summary judgment we accept as true, recalls the conversation with the escrow agent this way: "During that telephone conversation, I restated and re-emphasized to him [i.e., the escrow agent] . . . *that the underlying Note had not been satisfied since the check tendered to California National Bank had not been cleared and good funds had not been collected.* Furthermore, I told him at that time that California National Bank would not forward for recording a reconveyance of its deed of trust securing repayment of the Note with Joseph Keyshawn Johnson until such time as the Note was paid in full with good funds—meaning, that the check tendered to California National Bank was collected upon and monies deposited with California National Bank." (Italics added.)

On that same day, July 29, 2002, Gold Mountain also learned about the purported payoff of the Johnson loan. Counsel for Gold Mountain sent a facsimile to Wilshire Escrow stating its concern that the escrow agent confirm that Gold Mountain's deed would be in first position. Gold Mountain's counsel stated in the facsimile: "We have no way to verify that the borrow/buyer if [*sic*] fact prepaid the People's Bank loan. Normally, the title company handles loan pay-offs. I am writing to inform you of the above

---

[3] Since ICMG had previously obtained a financing commitment from Gold Mountain for the purpose of paying off Bank's loan, the surprise of the escrow officer at an apparent *payoff outside of escrow without using Gold Mountain's funds* is understandable.

information because my client expects to receive a policy of title insurance from your firm insuring my client's loan as a first deed of trust, and my client felt it important to inform you of the above facts."[4]

For reasons not reflected in the record, two days later, on July 31, 2002, Gold Mountain deposited $1.4 million into escrow.[5] ICMG executed a promissory note to Gold Mountain to be secured by a deed of trust on the property (Gold Mountain deed of trust).

On August 1, 2002, escrow closed on the property without receiving from Bank a reconveyance of its then-existing first trust deed.[6] Apparently in direct contradiction to existing escrow instructions from Gold Mountain and its counsel's written restatement of those instructions, Wilshire Escrow recorded the Gold Mountain deed of trust and the grant deed transferring title to the property and restaurant from Keyshawn to ICMG and transferred the $1.4 million received from Gold Mountain.

> d. *Bank Notified the Parties that the Check to Pay Off the Johnson Loan Was Not Honored and Bank Had Not Received Good Funds*

The check ICMG tendered to Bank on July 24, 2002, did not clear and the funds needed to pay off the Johnson loan were never collected. On August 5, 2002, the date on which the Douglas letter stated that Bank would have reconveyed its deed of trust, Bank sent a letter to Johnson's financial advisers entitled "Updated Demand for Payoff." The August 5, 2002, payoff demand statement stated that the Johnson loan had *not* been paid. Wilshire Escrow's agent was aware of this updated payoff demand statement and understood it to mean that ICMG's check to pay off the Johnson loan had not cleared and that Bank had reopened the loan. On September 4, 2002, about one month after Bank notified the parties that the Johnson loan had not been paid off, Gold Mountain assigned its deed of trust to lender defendants.

On September 25, 2002, Bank sent a letter to Johnson informing him that the obligation secured by Bank's deed of trust had not been satisfied, that the

---

[4] There is no way to determine from this record whether the escrow agent's call to Douglas occurred before or after he received the facsimile from Gold Mountain's counsel.

[5] ICMG had agreed to pay $2 million for the property, $600,000, of which was being paid by the borrower into escrow in order to close, and Gold Mountain was financing the remaining $1.4 million. Though the record indicates the funds were deposited into escrow, it does not indicate who received the $1.4 million at the close of escrow. Incredibly, at oral argument, none of the counsel present were able to state with any certainty just what happened to these funds, other than to confirm that they were *not* delivered to Bank.

[6] We place some emphasis on the fact that this closing date was *four days prior* to the anticipated reconveyance recording date specified in the Douglas letter.

ICMG transaction was void, and that if Bank did not receive funds by October 25, 2002, it intended to commence foreclosure proceedings.

### 3. *Bank Initiated Foreclosure Proceedings and Lender Defendants Moved for Summary Judgment*

On October 30, 2002, Bank filed this action against lender defendants, who, in turn, filed a verified cross-complaint against bank.[7] Bank also sought and obtained a receiver for the property and restaurant. The trial court issued a temporary restraining order in aid of the receiver, which prevented lender defendants from "selling, transferring, disposing, encumbering, or concealing the property without a prior court order"; and "doing any act that will impair the preservation of the property or plaintiff's interest in the property." In confirming the appointment of the receiver, on December 4, 2002, the trial court issued a preliminary injunction continuing these restraints.

Two months after Bank filed its complaint, lender defendants brought motions for summary judgment on Bank's complaint and on their cross-complaint. They contended that Bank could not succeed on any of its causes of action because it had no lien on the property, and that lender defendants had the only secured interest in the property. In their motions, lender defendants characterized the Douglas letter as an "update" of the June 20, 2002, payoff demand statement, which, in their view, committed Bank to the proposition that there was nothing due and owing on the Johnson loan. Lender defendants argued that Bank's only recourse for any mistake or misstatement in the Douglas letter was to file an action against Johnson as an unsecured creditor.

The trial court took the matter under submission and later granted summary judgment in favor of lender defendants. It first concluded that the Douglas letter was a payoff demand statement. Its written minute order states: "The letter from California National Bank was clear, unambiguous, it came from the bank, it was a pay-off letter and constituted an unequivocal pay-off demand." The trial court further concluded that any amendment to a payoff demand statement had to be communicated in writing under section 2943, subdivision (d)(2), and could not be changed or amended by an oral conversation, apparently referring to Douglas's subsequent communication with the escrow agent. Therefore, absent a written amendment, according to the trial court, the parties could reasonably rely on the Douglas letter

---

[7] Johnson also filed a cross-complaint against Bank and ICMG. The issues raised by this pleading are not before us in this appeal.

(showing a zero balance on the Johnson loan) to close escrow based on Bank's representation that it had received payoff funds. Because the escrow agent could reasonably rely on the Douglas letter, the trial court reasoned that it was irrelevant that Bank had received a payoff check that was later dishonored. The trial court concluded that Bank had, in effect, understated the amount owed in an amended payoff demand statement. Relying on *Freedom Financial Thrift & Loan v. Golden Pacific Bank* (1993) 20 Cal.App.4th 1305 [25 Cal.Rptr.2d 235] (*Freedom Financial*), disapproved on other grounds in *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 53, fn. 5 [57 Cal.Rptr.2d 687, 924 P.2d 996], the trial court extinguished Bank's lien, holding that Bank had no more than an unsecured interest and its only recourse was to recover the balance from the borrower (i.e., Johnson).

Thereafter, the trial court took lender defendants' motion for summary judgment off calendar, and ultimately dismissed lender defendants' cross-complaint. Both parties appealed.[8]

### 4. *Lender Defendants Unsuccessfully Attempted to Foreclose on the Property*

Following the court's ruling granting summary judgment, lender defendants noticed a trustee's sale to foreclose on the Gold Mountain deed of trust. Bank filed an ex parte application for a temporary restraining order preventing the foreclosure sale, arguing the preliminary injunction prevented lender defendants from foreclosing on the property. Lender defendants, in turn, sought ex parte relief to dissolve the preliminary injunction preventing them from foreclosing on the property. The trial court denied Bank's ex parte application but granted the one lender defendants submitted. The trial court dissolved the preliminary injunction, effective May 21, 2003.

On May 16, 2003, Bank filed a petition for writ of supersedeas with this court to prevent the imminent foreclosure of the property. On May 20, 2003, we stayed all proceedings pending further order of the court. We stated: "The stay includes prohibition of the sale, transfer, or encumbrance of the subject

---

[8] Lender defendants appeal from the trial court's order dismissing their cross-complaint because they contend that as a matter of law, they established their slander of title claim and should have been awarded damages on that claim. Upon granting the summary judgment in lender defendants' favor on Bank's complaint, the trial court dismissed their cross-complaint without reaching the merits of their motion. As will be discussed, because we are reversing the summary judgment, we must also reinstate the lender defendants' cross-complaint. In reinstating the cross-complaint, we intend no opinion or expression of view on the merits of the claims raised therein, including the one for slander of title.

property in any manner whatsoever." On July 2, 2003, after further briefing, we granted Bank's petition for a writ of supersedeas pending the outcome of this appeal.[9]

## CONTENTIONS

Bank contends that the trial court erred in granting summary judgment because the Douglas letter was not a payoff demand statement and therefore could not extinguish its secured interest in the property. Bank asserts that based on the Douglas letter, Douglas's declaration, and the escrow instructions, there are triable issues of fact bearing on (1) whether Wilshire Escrow could rely on the Douglas letter to close escrow, and (2) whether Bank holds a first priority lien on the property.

## DISCUSSION

### 1. *Summary Judgment Law and Standard of Review*

██ A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) "If a party moving for summary judgment . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Id.* at p. 855.) Lender defendants, as the moving parties bear the burden of persuasion that there is no triable issue of material fact and that they are entitled to judgment as a matter of law. (*Id.* at p. 850.) Lender defendants also bear the initial burden of production to make a prima facie showing. (*Ibid.*) "A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Id.* at p. 851.)

██ In reviewing an order granting a motion for summary judgment, we independently review the record to determine whether there are triable issues of material fact. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].) In doing so, we view the parties' evidentiary

---

[9] On August 6, 2003, we clarified our order to include a stay of all proceedings in this action pending further order of the court.

submissions in a light most favorable to Bank as the losing party. (*Ibid.*) As we explain, based on this standard, we conclude that triable issues of fact exist precluding summary judgment on Bank's complaint.

### 2. The Trial Court Erred in Granting Summary Judgment Because the Douglas Letter Is Not a Payoff Demand Statement

Bank contends that the Douglas letter was not a payoff demand statement and could not be the basis upon which the trial court extinguished its lien on the property. We agree. The trial court misapplied the statute; the Douglas letter is not a payoff demand statement.

### a. Statutory Definition of a Payoff Demand Statement

Section 2943 defines the procedures to pay off a secured loan and "establish[es a] mechanism[] by which an entitled person may obtain information regarding the status of an obligation secured by a deed of trust or mortgage." (*Freedom Financial, supra*, 20 Cal.App.4th at p. 1309.) We are concerned here with the provisions in the statute that describe the type of information that a beneficiary must provide in a payoff demand statement, how a beneficiary must communicate an amendment to a payoff demand statement, and who may rely on a payoff demand statement. While other cases have addressed the latter point and discuss the beneficiary's remedies in the event of a mistake in a payoff demand statement, this case is the first, to our knowledge, that addresses the first two points, that is, what is, and is not, a payoff demand statement (or an amended payoff demand statement). Three subdivisions of section 2943 are relevant to this discussion.

Section 2943, subdivision (a)(5), provides in pertinent part that a " 'payoff demand statement' means a written statement prepared in response to a written demand made by an entitled person or authorized agent, setting forth the amounts required as of the date of preparation by the beneficiary, to fully satisfy all obligations secured by the loan that is the subject of the payoff demand statement. The written statement shall include information reasonably necessary to calculate the payoff amount on a per diem basis for the period of time, not to exceed 30 days, during which the per diem amount is not changed by the terms of the note."

Section 2943, subdivision (d)(1), provides that "[a] beneficiary statement or payoff demand statement may be relied upon by the entitled person or his or her authorized agent in accordance with its terms, including with respect to the payoff demand statement reliance for the purpose of establishing

the amount necessary to pay the obligation in full. If the beneficiary notifies the entitled person or his or her authorized agent of any amendment to the statement, then the amended statement may be relied upon by the entitled person or his or her authorized agent as provided in this subdivision."

Subdivision (d)(2) of section 2943 sets forth the procedure for amending the payoff demand statement. It states: "If notification of any amendment to the statement is not given in writing, then a written amendment to the statement shall be delivered to the entitled person or his or her authorized agent no later than the next business day after notification." (*Ibid.*)

> b. *The Douglas Letter Informed the Parties of the Status of the Transaction, Not the Amounts Owing to Pay Off the Johnson Loan*

The Douglas letter does not satisfy the statutory requirements of a payoff demand statement, and it cannot properly be so construed. (§ 2943, subd. (a)(5).) It did not advise the borrower of the sums needed to pay off the loan, nor did it provide a per diem interest rate as required under the statute. The Douglas letter states that Bank had "received payoff funds" for the Johnson loan in the amount of $1,175,247.14. It also said, in the second paragraph, that no reconveyance could be recorded (an express requirement of Gold Mountain escrow instructions) until 10 days after receipt of the *"payoff check."* In this context, the phrase "payoff funds" was not used as a term of art but was used to inform the escrow agent of an event *not* contemplated by the escrow instructions; that is, the receipt outside of escrow of a check purporting to pay off the Johnson loan.

 Our conclusion that the Douglas letter is not a payoff demand statement is consistent with the purpose of section 2943, subdivision (a)(5). That subdivision sets forth the necessary requirements of the payoff demand statement so that *a borrower* who desires to pay off a mortgage in full will know the exact amount due on the loan on a specific date. The statute permits the borrower to rely on that payoff demand statement (§ 2943, subd. (d)(1)), and that if the amount in the payoff demand statement is understated, for whatever reason, the beneficiary's recourse is to recover any sums still owing from the borrower as an unsecured debt. (§ 2943, subd. (d)(3);[10] *Freedom*

---

[10] Section 2943, subdivision (d)(3), provides in pertinent part: "[A]ny sums that were due and for any reason not included in the statement or amended statement shall continue to be recoverable by the beneficiary as an unsecured obligation of the obligor pursuant to the terms of the note and existing provisions of law."

*Financial, supra,* 20 Cal.App.4th at pp. 1310–1313; see also *Cathay Bank v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 266, 270–271 [53 Cal.Rptr.2d 595].) The statute benefits the borrower. It does not state that any person can rely on a payoff demand statement for purposes of establishing whether the amount necessary to pay the obligation in full has in fact been satisfied. Thus, this statutory framework is not intended, in our view, to apply to a situation such as the one here, where the Douglas letter not only did not meet the statutory requirements of a payoff demand statement but was not intended to inform the borrower of the amount necessary to satisfy his obligation. The Douglas letter instead provided information to the concerned escrow agent as to an unanticipated "outside of escrow" development with respect to the Johnson loan.

We acknowledge that by the use of the term "payoff funds" the Douglas letter is imprecise and ambiguous, but that does not mean that we should read it as a payoff demand statement as lender defendants suggest. Lender defendants assert that the use of the phrase "payoff funds," followed by the amount received, indicated to the escrow agent that there was a zero balance due and owing on the Johnson loan. That reading, however, is not justified given the entirety of the letter and the factual context in which it was submitted. We emphasize that the Douglas letter states that Bank had received a *"pay off check"* and would issue a full reconveyance of the deed of trust 10 days *after the check cleared.* This is not a necessary requirement of a payoff demand statement, nor are such words normally found in a payoff demand statement. More importantly, nothing in this letter could be relied upon to justify the closing of the escrow *prior to August 5, 2002.*

For this reason, lender defendants' reliance on cases discussing the remedy for an understated or mistaken payoff demand statement is misplaced. (See *Cathay Bank v. Fidelity Nat. Title Ins., supra,* 46 Cal.App.4th at pp. 270–271; *Freedom Financial Thrift & Loan v. Golden Pacific Bank, supra,* 20 Cal.App.4th at pp. 1310–1313.) The Douglas letter was not a payoff demand statement and cannot be the basis for extinguishing Bank's lien on the property. Under these circumstances, section 2943, subdivision (d)(3), setting forth the available remedy for an understated payoff demand statement, has no application. Bank's remedy is not limited to an action against the borrower as an unsecured creditor.[11]

---

[11] We summarily reject lender defendants' argument that the Douglas letter is a written update of the June 20, 2002, payoff demand statement. As Bank points out, the June 20, 2002, payoff demand statement expired in 30 days. At that point, Bank had to provide another payoff demand statement, which it did on August 5, 2002.

### c. *The Douglas Declaration Did Not Constitute an Amendment to the Payoff Demand Statement*

Lender defendants moved to exclude Douglas's declaration in which she testified regarding her subsequent conversation with the escrow agent because, in their view, her testimony was tantamount to an attempt to make an oral amendment to a payoff demand statement, and any such amendment had to be in writing under section 2943, subdivision (d)(2).[12] The trial court did not specifically rule on this objection but implicitly rejected the Douglas declaration and relied instead on the Douglas letter. Douglas's declaration provided relevant evidence as to the purpose and intent of the Douglas letter and the fact that such information had been communicated to Wilshire Escrow *prior* to the August close of escrow. Given that her declaration was offered in opposition to a motion for summary judgment, it was relevant to demonstrate the existence of unresolved issues of fact. Her testimony was undisputed and it should not have been excluded.

As stated, section 2943 permits a lender to amend a payoff demand statement. If the amendment is not in writing, "then a written amendment to the statement shall be delivered . . . no later than the next business day after notification." (§ 2943, subd. (d)(2).)

Douglas's declaration does not memorialize an oral amendment to a payoff demand statement for the obvious reason that the Douglas letter was not a payoff demand statement. Moreover, Douglas's testimony does not attempt to amend the amount stated in her letter but simply sought to clarify Bank's position regarding the status of the Johnson loan and to inform the parties of the procedure Bank would follow to reconvey its deed of trust *after* confirming receipt of good funds. Finally, section 2943, subdivision (d)(2), requiring an amendment to be in writing, is not a rule of evidence upon which the testimony could have been excluded. For all of these reasons, the trial court erred in failing to consider the Douglas declaration when ruling on the summary judgment motion.

---

[12] Lender defendants also moved to strike Douglas's declaration on the grounds that it was barred by the best evidence rule (Evid. Code, § 1523), and was irrelevant. Although Douglas could not testify regarding the contents of her letter, testimony of her subsequent communication with Wilshire Escrow regarding the status of the Johnson loan and the mechanics of reconveying Bank's deed of trust was not properly excluded on these grounds. This evidence was relevant to demonstrate the existence of triable issues of fact with respect to whether Wilshire Escrow and Gold Mountain had reasonably relied on the Douglas letter to close escrow on August 1, 2002, four days before bank indicated it would reconvey its deed of trust, especially in view of the fact that escrow instructions Gold Mountain submitted prohibited any closing of the sale until all prior liens were reconveyed through escrow, and Gold Mountain received a recorded first priority lien.

### 3. *There Is a Question of Fact as to Whether the Parties Could Reasonably Rely on the Douglas Letter to Close Escrow*

In granting summary judgment, the trial court concluded that the Douglas letter was "clear and unambiguous" and that as a matter of law Bank was equitably estopped from asserting that it had a first deed of trust on the property because Wilshire Escrow and Gold Mountain detrimentally relied on the Douglas letter to close escrow. We disagree.

■ Equitable estoppel requires that " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423], quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) Here, there is a clear conflict in the evidence with respect to the factual information Bank provided to the parties *prior* to the close of escrow. Such conflict must be resolved in a trial before any conclusion can be drawn as to the justification for Gold Mountain's and the escrow agent's reliance on the Douglas letter to fund the loan to ICMG and close escrow prior to August 5, 2002, and in defiance of clear escrow instructions to the contrary.

Moreover, in our view, the Douglas letter is clearly ambiguous. As discussed, while, in the first paragraph, the Douglas letter indicated that Bank had received payoff funds, the second paragraph of the letter expressly stated that Bank would not issue a full reconveyance of its deed of trust until "*10 days after receipt of the pay off check.*" Thus, the letter is entirely consistent with the proposition that while "payoff funds" had been received, they were in the form of a check that had not yet cleared. Accordingly, no reconveyance would be delivered until a 10-day period had elapsed.

When the Douglas letter is considered together with Douglas's declaration, there are several unresolved issues of material fact.[13] In her declaration, Douglas testified that in her subsequent telephone conversation with the escrow agent she confirmed that bank would not reconvey its deed of trust until August 5, 2002, to ensure that the check tendered to pay off the Johnson loan had cleared and that Bank had received good funds. This undisputed testimony raises triable issues as to the extent of Wilshire Escrow's knowledge of the actual facts and whether either it or Gold Mountain had any

---

[13] We again emphasize that, given the fact that this case is before us on an appeal from a summary judgment, we accept the statements made in the Douglas declaration as true. At a trial, when all of the evidence may be considered the trier of fact may well conclude otherwise.

reasonable or justifiable basis for their claimed reliance on the Douglas letter to close escrow on August 1, 2002, or to permit the close of escrow, prior to August 5, 2002, the expiration of the 10-day period specified in the Douglas letter.

Lender defendants contend that we read too much into the second paragraph of the Douglas letter. They assert that the delay in recording reconveyances is common and that the Douglas letter did not indicate that the reconveyance was conditional, only that Bank would *eventually* reconvey its deed of trust. That argument, however, not only ignores the specific contrary escrow instructions (the defiance of which, lender defendants have never explained) but also flies in the face of the uncontroverted facts. Douglas stated that she told the escrow agent that the reason Bank would not reconvey until August 5, 2002, was in order to ensure that Bank had received good funds to pay off the Johnson loan. Thus, in this case, the delay was for a stated reason that had been timely communicated to the escrow agent.

In addition to the Douglas declaration, there is other evidence that the trial court did not consider which also support the conclusion that there exist unresolved issues of fact. Wilshire Escrow's agent testified to being on "heightened alert" because Bank had received funds outside of escrow to pay off the Johnson loan, yet inexplicably closed escrow before confirmation that Bank had received good funds. By closing escrow without a reconveyance of Bank's deed of trust, the escrow agent violated Gold Mountain's escrow instructions. Those escrow instructions specifically provided that the agent must not "record if you are aware of any liens which affect the subject property . . . which are not paid in full in escrow and which are not cleared of record." As of August 1, 2002, when escrow closed, Bank had not reconveyed its deed of trust. Thus, the escrow agent apparently recorded even though Bank still had a senior lien on the property that had not been cleared of record.

Moreover, Gold Mountain also raised concerns following receipt of the Douglas letter. Gold Mountain's counsel asked the escrow agent to confirm that the Johnson loan had been paid off to ensure Gold Mountain would have a first priority on the property. Douglas's communication with the escrow agent in which she told him that Bank would not reconvey its deed of trust until it had received good funds, is imputed to Gold Mountain. (3 Miller & Starr, Cal. Real Estate (3d ed. 2003) § 6.23, pp. 52–56; see, e.g., *Thein v. Stichla* (1949) 93 Cal.App.2d 295, 298 [209 P.2d 13] [agent's knowledge that buyer had deposited funds into escrow imputed to seller].) Thus, Gold Mountain is chargeable with the same knowledge of Bank's position regarding the reconveyance of its deed of trust that Wilshire Escrow had. Accordingly, it certainly cannot be said, as a matter of law, that Bank is equitably estopped from asserting its lien on the property.

### 4. *The Question of Lien Priority Is a Factual Dispute*

Although the judgment is based on section 2943, lender defendants (as successors to Gold Mountain) necessarily convinced the trial court that they have a first deed of trust on the property because they were not aware of Bank's deed and therefore are encumbrancers in good faith. "[A] *'good faith'* encumbrancer is one who acts *without knowledge or notice* of competing liens on the subject property. [Citations.]" (*Brock v. First South Savings Assn.* (1992) 8 Cal.App.4th 661, 667 [10 Cal.Rptr.2d 700].) As counsel for lender defendants conceded, however, his clients cannot stand in any better position than Gold Mountain. The record before us clearly reflects that both Wilshire Escrow and Gold Mountain questioned the payoff of the Johnson loan outside of escrow, and that Wilshire Escrow learned that Bank had *not* received good funds and would not record a reconveyance of its deed of trust until it had been paid off. What the record does not disclose, is why, given such notice of noncompliance with the escrow instructions, Wilshire Escrow and Gold Mountain permitted the escrow to close.

Given the record before us, it appears that Bank had a valid lien on the property at the time escrow closed. As Bank argues, Gold Mountain's belief that it would be in a first position and that Bank's deed would eventually be reconveyed is not the same as having no knowledge of Bank's prior deed of trust. Thus, because there is a factual issue as to whether lender defendants' predecessor in interest, Gold Mountain, was a bona fide encumbrancer for value, the question of lender defendants' status as a bona fide encumbrancer cannot be determined as a matter of law. For this reason, and those previously discussed, it was error to grant summary judgment on bank's complaint.[14]

### 5. *The Effect of Our Ruling on the Court's Stay of Proceedings*

As stated, following the trial court's order granting summary judgment, the trial court dissolved the preliminary injunction, and lender defendants initiated nonjudicial foreclosure proceedings. We issued an order staying all proceedings until resolution of this appeal. We now conclude that the trial court erred in dissolving the preliminary injunction. The injunction must be reinstated until the issues raised by these parties (and others in this litigation) have been resolved by the trial court.

---

[14] Although there is no need for an extended discussion on the point, we must note that the trial court's order dismissing lender defendants' cross-complaint was necessarily dependent upon its prior grant of summary judgment in favor of lender defendants on Bank's complaint. Therefore, that order must also be reversed.

## *DISPOSITION*

Consistent with the views expressed herein, we reverse the judgment entered following the trial court's order granting summary judgment in favor of lender defendants on bank's complaint. The order dismissing lender defendants' cross-complaint is also reversed. We further reverse the order of May 15, 2003, which dissolved the preliminary injunction prohibiting the parties from "selling, transferring, disposing, encumbering, or concealing the property without a prior court order," and direct the trial court upon remand to reinstate the preliminary injunction issued on December 4, 2002. The stay of trial court proceedings heretofore issued by this court shall be dissolved upon the issuance of the remittitur herein. Bank is awarded its costs on appeal.

Klein, P. J., and Kitching, J., concurred.